UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, : | CASE NO.: 16CR420 (KMK) |
|                 PLAINTIFF : | |
| : | |
| v. : | |
| : | |
| GJON SALJANIN, : | |
|                 DEFENDANT : | April 11, 2018 |

**SENTENCING MEMORANDUM SUBMITTED ON
BEHALF OF DEFENDANT
GJON SALJANIN**

Bruce D. Koffsky
KOFFSKY & FELSEN, LLC
1150 Bedford Street
Stamford, CT   06905
(203) 327-1500

*Attorney for Defendant*
*GJON SALJANIN*

LAW OFFICES OF
# KOFFSKY & FELSEN, LLC
1150 Bedford Street
Stamford, Connecticut 06905
(203) 327-1500
Facsimile (203) 327-7660

April 11, 2018

<u>Via ECF/email</u>

The Honorable Kenneth M. Karas
United States District Judge
Southern District of New York
300 Quarropas Street
White Plains, NY 10601

Re:     <u>United States v. Gjon Saljanin</u>
        S2  16CR420 (KMK)

Dear Judge Karas:

This memorandum is submitted on behalf of Gjon Saljanin, who is scheduled to be sentenced before the Court on April 18, 2018. This sentencing memorandum is submitted for the Court's consideration, to assist the Court in determining a sentence that serves the sentencing goals of 18 U.S.C. § 3553(a) and the interests of justice.

## INTRODUCTION

The prosecution of Gjon Saljanin is predicated on his January 15, 2014 theft of computers from an interstate shipment contracted to be loaded and delivered by his brother, Anton Saljanin. In the early hours of the morning on September 2, 2015, Gjon Saljanin was taken into custody by law enforcement and presented before Magistrate Lisa M. Smith on a sealed Complaint that had been filed several days previously. *See Docket Entries for Docket Number 7:15mj3093 (UA)*. At his initial appearance, Mr. Saljanin was apprised of the charges against him, appointed the undersigned as counsel and, in that Magistrate Smith determined that there existed a combination of conditions that would reasonably assured the safety of the community and the appearance of Mr. Saljanin, ordered his release. For the next year, Mr. Saljanin complied with all terms and conditions set by the Court; made every appointment with Pretrial Services, attended mental health counseling, was ever-present for his family and comported himself as any honest and upstanding member of society would.

On September 29, 2016, a Four Count Indictment was filed against Gjon Saljanin and others for the theft, possession and sale of over 1000 Apple laptops. Again, another year went by wherein Gjon Saljanin's behavior and activities fully complied with the requirements of his release.

On October 16, 2017, Gjon Saljanin appeared before Magistrate Smith and entered a plea to Count One of the Indictment charging him with Conspiracy to Commit Theft from an Interstate Shipment in violation of 18 U.S.C. § 371. Pursuant to the terms of the plea agreement, Gjon Saljanin was required to allocute that he conspired together with Anton Saljanin, his brother, and others in committing the charged conspiracy. The plea agreement, entered into between the government and defendant, concluded that the defendant's base offense level, pursuant to U.S.S.G. § 2B1.1(a)(2) was a 6. The parties agreed that the loss amount attributed to the defendant's conduct was between $550,000 and $1,500,000 and as such, 14 levels are added to the base level. The parties additionally agreed that two levels are added for an "organized scheme" enhancement and two levels are added for an "obstruction" enhancement. Importantly, the parties agreed that Mr. Saljanin played a Minor Role in the conspiracy and as such, was entitled to a role-reduction of two points pursuant to § 3B1.2(b). Mr. Saljanin has accepted responsibility for his criminal conduct thereby earning the 3-level reduction pursuant to U.S.S.G. § 3E1.1. In sum, the parties agreed that Mr. Saljanin's total offense level was 19. The parties are in agreement that Mr. Saljanin has no criminal history, no criminal history points and as such, he falls within Criminal History Category I which, when coupled with his total offense level, results in an advisory Guideline Sentencing Range of 30 to 37 months. Finally, as part of the agreement, Mr. Saljanin agreed and stipulated that he is responsible for restitution to the victim in an amount of $989,424.15.

## **DEFENDANT'S REQUESTED SENTENCE**

We know that the Court will closely examine and evaluate Gjon Saljanin's history and characteristics in addition to the offense of conviction. We hope that the Court will determine that, in this particular case, a non-guideline sentence is appropriate.[1] But in addition to the specific characteristics of the defendant and his role in the admitted criminal conduct, Mr. Saljanin submits that a non-guideline sentence is additionally warranted in that the fraud/theft guidelines, upon which the defendant's sentencing range is principally based, is "fundamentally flawed" and that these guidelines have become "divorced" from the objectives of 18 U.S.C. 3553(a). Together will all the

---

[1] A court may impose a sentence outside the properly calculated sentencing guideline range through either a departure or a variance. A "departure" is typically a change from the final sentencing range computed by examining the provisions of the Guidelines themselves. It is frequently triggered by a prosecution request to reward cooperation . . . or by other factors that take the case "outside the heartland" contemplated by the Sentencing Commission when it drafted the Guidelines for a typical offense. A "variance," by contrast, occurs when a judge imposes a sentence above or below the otherwise properly calculated final sentencing range based on application of the other statutory factors in 18 U.S.C. § 3553(a). See U.S. Sentencing Commission, Departure and Variance Primer, June 2013. (http://www.ussc.gov/sites/default/files/pdf/training/primers/Primer_Departure_and_Variance.pdf ).

reasons presented, the defendant requests that the Court impose a non-incarceratory sentence which would include home confinement, location monitoring, community service, mental health treatment, employment counseling and any of a host of other punitive measures which would fall just short of imprisonment. We believe that the Court can find that such a sentence would be sufficient, but no more than necessary to satisfy the directives of 18 U.S.C. § 3553(a).

**The Nature and Circumstances of the Offense**

Gjon Saljanin's Offense Conduct is described in Paragraphs 13 through 22 of the defendant's Presentence Report with, we believe, some slight modification which is made evident by the Government's Sentencing Submission as to co-defendant Ujka Vulaj. (See Docket Entry 129, 7:16cr420 (KMK), filed May 8, 2017.)

Anton Saljanin, the defendant's older brother, was employed as a truck driver who, relying on rented commercial trucks, delivered loads of merchandise up and down the eastern states. On January 15, 2014, Anton Saljanin and Gjon Saljanin traveled in one such truck to Massachusetts where a shipment of Apple laptop computers was loaded onto the truck for delivery to New Jersey. Of course, the laptops never made it to their final destination. Anton Saljanin and Gjon Saljanin drove the truck to a garage at the home of co-defendant Ujka Vulaj where the contents of the truck were unloaded. The next day, after Anton Saljanin reported that the truck had been stolen, Gjon Saljanin lied to the police about the brothers' travels and the whereabouts of the truck and cargo. The defendant avers that that is the sum total of his involvement in the criminal conduct charged by the government in their Indictment.

Without being overly persnickety, Gjon Saljanin wants to correct one small recitation in the probation officer's report regarding his personal involvement in the delict admitted to. Paragraph 17 reads in part, "[t]hroughout the course of the day, multiple phone calls were made between ANTON SALJANIN and VULAJ, and between GJON SALJANIN and VULAJ." As the 17-page attachment to the government's Vulaj sentencing submission illustrates, out of the hundreds of telephone calls between the participants of this conspiracy, just three calls involved Gjon Saljanin's telephone. What's more, Anton Saljanin has admitted to the government that he used Gjon Saljanin's telephone to call Vulaj as his phone ran out of power on the way to Yorktown, New York, where the laptops were off-loaded. We believe the evidence and understanding of the government is that Gjon Saljanin was not in contact with the other members of the conspiracy, did not direct it nor the other participants and did not engage in the disposition of the stolen laptops.

In addition to his complete lack of communication with the others charged in the conspiracy, Gjon Saljanin didn't make a single farthing as a result of his involvement in the theft of the laptops; he didn't get a cut of the profit, he didn't take a pallet of computers nor sell, barter or gift even a single laptop, his kids didn't get a new Macbook to do homework or play Mario Brothers. Gjon

4

Saljanin got nothing. Gjon Saljanin's involvement in the conspiracy occurred over a dozen or so hours without any financial gain to himself.

Of course, Gjon Saljanin doesn't offer the above factual recitation to distance himself from his guilty plea, his prior full-throated admission to being a member of the conspiracy or his understanding that he will be, jointly and severally, responsible for the payment of restitution for years to come; rather, like in so many things, he wants to identify that there are shades of grey, even in a Court's consideration of what is meant by "minor role."

Attached hereto is the defendant's own statement of admission and letter of apology for the Court's consideration. (See Exhibit A attached hereto.)

## **PERSONAL HISTORY AND CHARACTERISTICS**

**A. Personal History and Career**

In considering Gjon Saljanin's personal characteristics, one cannot escape the interplay between the old world and the new. Just before his birth, the defendant's parents left Yugoslavia when it was still a Soviet backwater with medieval tribal sensibilities. The Saljanin family moved to Bronx, New York, leaving Stalin behind, but not the Albanian culture that suffused their world-vision. Three Saljanin U.S.-born children soon followed, and their parents managed to make ends meet, Gjon's father as the superintendent/handyman of their Bronx tenement house and Gjon's mother as a maid.

Gjon Saljanin remembers his childhood as being like any other "normal American" kid first in the Bronx and then after the family's move to Yonkers. As he was a slow reader and slow learner, Gjon recalls being relegated to special education classes and being forced to repeat Third Grade. It didn't help that his parents' English continued to be so poor that they were unable to get involved in either his studies or in fostering an environment where education was important; Gjon cannot recall a single teacher-parent conference his parents attended. As school wasn't important to his parents and as it became more difficult, it became irrelevant to Gjon. What was important? Remembering his Albanian cultural history and never turning his back on this family. There wasn't a conversation in the family household that wasn't suffused with who the Saljanins' were and where they came from.

Gjon Saljanin left school at 14 and began working for his father at some side jobs his father had secured cleaning doctor's offices in Yonkers. At 19, he found employment as a doorman at one of the swanky Park Avenue residential towers in Manhattan. After a time, Gjon Saljanin joined the Doorman Union and reaped the benefits that came with it. Dressed in a uniform with white shirt,

tie and cap, Mr. Saljanin worked all shifts, in all weather for 23 years before his arrest in this case forced his employers and the Union to let him go.

At the age of 22 and following the instructions of his father who had consulted with a matchmaker, Gjon Saljanin traveled to Albania to the home of distant relatives. There, in a village of 5000, he was introduced to Andurella, a young lady who had never travelled more than 20 miles from her parents' home. During a two-week courtship which was chaperoned by her parents, Gjon Saljanin and 16 year-old Andurella, embarked on getting to know each other much like my great, great, great grandparents must have. The day before his return flight home, Gjon Saljanin and Andurella stood before the local priest and were married. Gjon Saljanin returned to Yonkers, his doorman occupation, living with his parents and waited 12 months for Andurella to follow.

For the next 23 years, Gjon Saljanin lived an uneventful, disciplined, insular life. His parents cobbled together enough money to purchase a three-family home in Yonkers and Gjon and his family, together with his brother Anton and his family, moved in each taking a separate floor.[2] Gjon and his wife worked, parented, prayed and existed in what was a miniature Albanian shtetl. Gjon didn't commit crimes, cheat on his taxes or fail to pay his bills. And on one otherwise uneventful day in January 2014, Gjon Saljanin's brother told him to take a ride to Massachusetts with him.

Gjon Saljanin was not born into poverty nor can he hide behind a Dickensian back-story. Rather, prior to being charged in this case, Mr. Saljanin had all that he could wish for; a beautiful wife, adorable and adoring children, a comfortable home, a twenty-year employment history and the respect of his community. Of course, he now stands before the Court about to be sentenced for a federal felony with its attendant penalties for agreeing to go for a ride with his brother and committing the crime charged.

**Personal Characteristics as Described in Letters of Support**

Since one of the factors that the Court is directed to consider in applying 18 U.S.C. § 3553(a) is the history and characteristics of the defendant, a review of some of the letters in support of Gjon Saljanin best illustrate the type of person he is. (See Letters in Support attached hereto as Exhibit B.)

Altin Veseli, a co-worker of Mr. Saljanin for 10 years describes the defendant with words like "fine and responsible," "hardworking, trustworthy, friendly and courteous." Mr. Veseli writes "In addition, to all these notable character traits, he was most importantly, a great father and family man. As a friend, I have watched the strong bond he has built with his three daughters throughout

---

[2] Several years ago, Gjon Saljanin's parents gifted 1/3rd interests in the family home to both Gjon and Anton Saljanin. That interest is the asset that is described in the Probation Report. Of course, Gjon Saljanin's parents, wife, children, sister-in-law and nieces and nephews continue to reside in the home.

6

the years, by being an integral part of his girls' lives: taking them to school and afterschool activities, soccer practice and many family vacations."

Angella Santos, a housekeeper in one of the Park Avenue apartment buildings where Gjon Saljanin worked writes of knowing Gjon for over 20 years and that he is trustworthy and loyal, a hard-working man with good work ethics. Ms. Santos writes "[w]hat I mostly admire about Gjon is his love and dedication to his family."

Attorney Peter Saljanin, a cousin 10 years younger than Gjon Saljanin, writes "having not read any of the submitted letters personally, I'm willing to wager that most, if not all, will tell you that Johnny is a compassionate family man, a hard worker; a devoted husband; and a wonderful father to his three beautiful daughters."

Luke Shkreli, a nephew of Gjon Saljanin writes that Gjon is his mentor, that to Luke, he is "reliable, hardworking, trustworthy, a committed husband and above all al dedicated father of three young daughters."

The portrait that emerges of Gjon Saljanin in these letters and the other letters attached is of someone who is committed to his family and friends, a conscientious parent, a hard worker and a portrait strikingly at odds with the image of a participant in a conspiracy to steal a cargo of laptops. The portrait that emerges of Gjon Saljanin in these letters, in his minor role, in his lack of prior criminal behavior might lead one to believe that his conduct in this Conspiracy was so obviously aberrant as to warrant significant consideration.

**ARGUMENT**

    **I.    A BELOW GUIDELINE SENTENCE OR VARIANCE IS APPROPRIATE IN THIS CASE**

    **A. Widespread Disagreement with the Fraud Guidelines is Evidence that it is Unsound**

The Sentencing Reform Act of 1984 directed the Sentencing Commission to promulgate guidelines that "assure the meeting of the purposes of sentencing." 28 U.S.C. § 991(b)(1)(A), and to use as a "starting point" the average sentences imposed, and prison times actually served during the pre-Guideline period, 28 U.S.C. § 994(m). Congress also instructed the Commission to review and revise the Guidelines in light of sentencing data, criminological research, and consultation with frontline actors in the criminal justice system. See 28 U.S.C. §§ 991(b)(1)(C), (b)(2), 994(o), 995(13), (15) and (16). But the original Commissioners abandoned efforts to design the Guidelines based on the purposes of sentencing after failing to agree on the predominating purposes, they instead drafted the Guidelines primarily based on an empirical approach drawn from pre-Guidelines

7

sentencing practices. *See* U.S.S.G., ch. 1, pt. A, §3 (2015); Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 Hofstra L. Rev. 1, 15-18 (1988).

The Supreme Court has offered two reasons for why it still may be fair to assume that the Guidelines "reflect a rough approximation" of sentences that "might achieve § 3553(a)'s objectives." *Rita v. United States*, 551 U.S. 338, 348-50 (2007). First, the original Commission used an "empirical approach," which began with an examination of 10,000 presentence reports setting forth what judges had done in the past." *Id*. At 348-49. Second, the Commission continually reviews and revises the Guidelines based on judicial feedback through sentencing decisions and consultations with other frontline actors, civil liberties groups and experts. *Id*. at 350.

But not all Guideline provisions were developed in this manner, and hence it is unfair to assume that they too reflect a rough approximation of the sentences achieving section 3553(a)'s objectives. *See Gall v. United States*, 552 U.S. 38, 46 n.2 (2007) (*citing Kimbrough v. United States*, 552 U.S. 85, 96 (2007). For example, when formulating the Guidelines for crack-cocaine offenses, the Commission "did not take account of 'empirical date and national experience'" *Kimbrough*, 552 U.S. at 109. In these circumstances, a district court may conclude that the particular guideline "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes, even in a mine-run case." *Id*. at 110.

The loss Guideline used to calculate Mr. Saljanin's advisory Guideline range similarly fails to account for empirical date and national experience, yielding a greater than necessary sentence. *United States v. Corsey*, 732 F.3d 366, 389 (2d Cir. 2013)(Underhill, J., concurring)("The loss guideline….was not developed by the Sentencing Commission using an empirical approach based on data about past sentencing practices.") As this Court said in *Corsey*, "[t]he Sentencing Commission set the original 1987 Guidelines for economic offenses higher than historical sentences in order to further the deterrence and just punishment goals of sentencing." *Id*. at 379. And Congress, through a series of three amendments "effectively multiplied several times the recommended sentence applicable in 1987." *Id*. at 380. These amendments were all adopted "without the benefit of empirical study of actual fraud sentences by the Sentencing Commission." *Id*. This "history of bracket inflation … renders the loss guideline fundamentally flawed." *Id*.

Because the Commission failed to fulfill its institutional role, the Court should give little heed to the exaggerated, one-size-fits-all[3] method of the fraud guidelines and give far more reliance on the general considerations as set forth in section 3553(a). *See Corsey*, 723 F.3d at 380.

---

[3] [T]he Commission could have approached monetary offenses quite differently. For example, it could have started the Guidelines calculation for fraud offenses by selecting a base level that realistically reflected the seriousness of a typical fraud offense and then permitted adjustments up or down to reflect especially large or small amounts of loss. Instead the Commission valued fraud (and theft and embezzlement" at level six, which translates in criminal history category I to a sentence as low as probation, and then let the amount of loss, finely calibrated into sixteen categories, become the principal determinant of the adjusted offense level

8

## **THE APPROPRIATE SENTENCE**

The United States Sentencing Guidelines provide the "starting point and the initial benchmark" for sentencing, Gall, 128 S. Ct at 596, and the District Courts must "remain cognizant of them throughout the sentencing process," Id, at 596 n.6. It is now, however, emphatically clear that the Guidelines are guidelines – that is, they are truly advisory. United States v. Cavera, 550 F.3d 180 (2d Cir. 2008) [Emphasis added]. "A district court may not presume that a Guideline sentence is reasonable, it must instead conduct its own independent review of the sentencing factors, aided by the arguments of the prosecution and defense. District Judges are, as a result, generally free to impose sentences outside the recommended range. Id. District judges may exercise discretion in fitting sentences to a defendant's individual characteristics. United States v. Crosby, 397 F.3d 103, 114 (2d Cir. 2005).

In exercising this discretion, judges are guided by 18 U.S.C. § 3553(a), which directs them to impose a sentence that is "sufficient, but not greater than necessary" to, among other considerations, "reflect the seriousness of the offense, . . . promote respect for the law, and provide just punishment for the offense," and to "afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2). The statute also directs courts to consider, among other things, "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1), as well as "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). It is submitted that a non-incarceratory sentence, in this particular case, strikes this balance.

---

and hence the corresponding sentencing range. This approach, unknown to other sentencing systems, was on the Commission was entitled to take, but its unusualness is a circumstance that a sentencing court is entitled to consider." *U.S. v. Alhahaim*, 15-2024cr (2d Cir. December 1, 2016).

## **CONCLUSION**

       Mr. Saljanin respectfully requests that the Court impose a non-incarceratory sentence which would include home confinement, location monitoring, community service, mental health treatment, employment counseling and any of a host of other punitive measures which would fall just short of imprisonment. We believe that the Court can find that such a sentence would be sufficient, but no more than necessary to satisfy the directives of 18 U.S.C. § 3553(a).

                                      RESPECTFULLY SUBMITTED,

                                      THE DEFENDANT,
                                      Gjon Saljanin

                                      BY__/s/ Bruce D. Koffsky___
                                      Bruce D. Koffsky, Esq.
                                      Koffsky & Felsen, LLC
                                      1150 Bedford Street
                                      Stamford, Ct 06905
                                      Tel.: 203-327-1500
                                      Fax: 203-327-7660
                                      Federal Bar No.: ct3772
                                      bkoffsky@snet.net

# CERTIFICATION

THIS IS TO CERTIFY that on April 11, 2018 a copy of the foregoing was filed electronically [and served by mail on anyone unable to accept electronic filing]. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

_/s/ Bruce D. Koffsky__
Bruce D. Koffsky